STATE of Wisconsin EX REL. Steven E. KEANE and First Wisconsin National Bank of Milwaukee, Petitioners-Appellants,

v.

BOARD OF REVIEW OF the CITY OF MILWAUKEE, and City of Milwaukee, Respondents.†

Court of Appeals

*No. 80–370.  Submitted on briefs September 10, 1980.—Decided November 24, 1980.*
(Also reported in 299 N.W.2d 638.)

† Petition to review denied.
BEILFUSS, C.J., took no part.

For the petitioners-appellants the cause was submitted on the brief of *Timothy C. Frautschi* of *Foley & Lardner* of Milwaukee.

For the respondent the cause was submitted on the brief of *Joseph H. McGinn,* principal assistant city attorney, with whom on the brief was *James B. Brennan,* city attorney of Milwaukee.

Before Decker, C.J., Moser, P.J., and Cannon, J.

DECKER, C.J.   Petitioners appeal from a judgment affirming property tax assessments of the respondent board of review upon certain improvements made by the law firm of Foley & Lardner (hereinafter lessee) to premises rented from First Wisconsin National Bank of Milwaukee (hereinafter lessor). Because we agree with appellants' contention that the lease of comparable property constituted the "best information" regarding fair market value of the leasehold improvements in question, we reverse.

In 1974, lessee moved from its offices on the 13th, 14th and 15th floors at 735 North Water Street,[1] Milwaukee, to new quarters on the 36th, 37th, 38th and 39th floors in the First Wisconsin Center at 777 East Wisconsin Avenue.   Before moving into the new quarters, lessee, on the 37th through 39th floors, had the standard floor plans altered, the heating and air conditioning systems upgraded, the floors leveled and reinforced, vaults built in, and installed: extra plumbing for lounges and restrooms; three spiral stairways between floors; a functional fireplace on the 38th floor with a chimney extending to the roof, a dumbwaiter between floors; and special wal-

[1] The main offices of the First Wisconsin National Bank of Milwaukee were at this location until completion of the construction of the First Wisconsin Center.

nut woodwork reflecting an 18th century Williamsburg motif. Lessee bore the cost of these improvements to the extent that they exceeded the cost of standard building improvements, but by terms of the lease, once the improvements were installed, the lessor became the owner.

On May 1, 1975, these "excess" improvements (over and above the value of the standard building improvements), termed "special leasehold improvements" by the parties, were valued at $1,140,000 by respondent city of Milwaukee, assessed to the lessee, and resulted in a tax assessment of $1,026,680.[2] On May 1, 1976, the same improvements were assessed at $1,112,100.[3] The latter assessment was subsequently reduced to $1,032,820 by respondent city's board of assessors. Lessee objected to the assessments and paid the taxes under protest. On July 7, 1977, respondent board of review held a combined hearing on lessee's objections from both years, at which substantial evidence was presented, and by letter dated July 12, 1977, sustained the tax assessments.

Appellants petitioned the circuit court for certiorari review pursuant to sec. 70.47(13), Stats. The writ was granted, with the matter remanded for failure of the board of review to adopt findings of fact and conclusions of law. On remand, the board of review held another combined hearing, sustained the 1975 valuation and assessment, reduced the 1976 valuation and assessment, and adopted formal findings and conclusions. Appellants secured another writ of certiorari, and the matter was remanded by the circuit court because of deficiencies in

[2] This represents 90.06% of fair market value, the 1975 assessment ratio established by the Wisconsin Department of Revenue for property located in the city of Milwaukee. The value of the standard building improvements was assessed to the lessor and is not challenged here.

[3] This is supposed to represent 83.64% of fair market value, applying the 1976 assessment ratio.

the findings and conclusions. Without further hearing, the board remedied the deficiencies, whereupon the court in its third review rendered judgment affirming the valuations and resultant assessments.

Appellants raise three arguments challenging the 1975 and 1976 assessments:

1. Subjecting the special leasehold improvements to taxation is fundamentally improper and results in double taxation because the land and office building containing leasehold improvements have already been subjected to taxation;

2. The fair market value of the special leasehold improvements was conclusively established by the lease of lessor's old offices at 735 North Water Street; and

3. Respondents improperly considered intrinsic value to lessee of the improvements in estimating their fair market value.

## I. DOUBLE TAXATION

■
We reject appellants' claim that respondents have illegally created an artificial unit of property subject to taxation by terming the special leasehold improvements personal property and collecting the tax assessments from lessee. Sec. 70.17, Stats., authorizes assessment of improvements on leased lands as either real or personal property. Respondents assessed lessor's office building as real property, and appellants seem to argue that:

(1) this mandates assessment of any special leasehold improvements to the building as real property;

(2) once this is done, the value of the special leasehold improvements cannot be separated from the value of the building; and

(3) because lessor already pays taxes on this latter value, double taxation occurs when respondents seek ad-

ditional taxes from lessee for the special leasehold improvements.

There is no evidence that respondents have included the value, if any, of special leasehold improvements in their assessment of lessor's building at 777 East Wisconsin Avenue. If the special leasehold investments have value, it is in addition to the value of the building and may be separately assessed.

For valuation purposes, it makes no difference whether respondents term the special leasehold improvements real or personal property. *State ex rel. Mitchell Aero, Inc. v. Board of Review,* 74 Wis.2d 268, 277, 246 N.W.2d 521, 525-26 (1976).

## II. VALUATION

Valuation of both real and personal property for property tax purposes is based upon fair market value, "the amount it will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *Id.* at 277, 246 N.W.2d at 526.

On certiorari, the sole function of the circuit court is "to determine, from the evidence presented to the board of review, whether the valuation was made on the statutory basis." *Rosen v. City of Milwaukee,* 72 Wis.2d 653, 661, 242 N.W.2d 681, 684 (1976). This court similarly must determine whether the valuation and resultant assessment were made on the statutory basis, "for such inquiry involves a question of law." *State ex rel. Geipel v. City of Milwaukee,* 68 Wis.2d 726, 732, 229 N.W.2d 585, 589 (1975). In so doing, we are guided by a presumption that the valuation is correct. *See Rosen, supra,* at 661-62, 242 N.W.2d at 684-85.

At the board of review hearings, Norman W. Steffen, a supervising assessor and chief assessor for respondent

city, testified to the basis for the challenged valuations. The 1975 valuation of $1,141,000 was based on an income approach to value, keyed to the additional rent an owner would charge to recover construction costs plus a nine percent return if it had paid for installation of the special leasehold improvements. The net rental income after deducting operating expenses was capitalized to estimate fair market value of the rented premises both with and without special leasehold improvements, with the difference establishing fair market value of the improvements. Steffen worked backwards from the $1,141,000 valuation, to show that his additional rent figure was reasonable.

The 1976 valuation eventually affirmed by the circuit court represented the 1975 valuation adjusted by a composite index number prescribed by the Wisconsin Department of Revenue for valuation purposes, reflecting both market appreciation and depreciation due to age. Steffen also testified that in reaching the estimated valuations he considered the following extrinsic factors: construction cost of the special leasehold improvements ($1,393,-630) ; insurance coverage ($2,069,000, including contents other than special leasehold improvements; $1,665,159 excluding furniture) ; and book value of the special leasehold improvements as evidenced from lessee's state partnership tax return for 1975 ($1,531,385.70).

Appellants argue that respondents are precluded from estimating fair market value by resort to formulas and extrinsic information because fair market value was conclusively established by a 1974 lease of property containing similar special leasehold improvements. The 1974 transaction occurred when lessee vacated its offices at 735 North Water Street, where it had installed special leasehold improvements similar to those at 777 East Wisconsin Avenue. Lessor was unable to command higher rent due to the improvements from the two tenants who moved into the Water Street office space.

Appellants' argument relies on the "best information" rule for determining fair market value:

The "best information" of such value is a sale of the property or if there has been no such sale then sales of reasonably comparable property. In the absence of such sales, the assessor may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. However, it is error to use this method "when the market value is established by a fair sale of the property in question or like property."

. . . .

Where the clear market value is *not* established by a sale or sales the assessor or the board of review should consider all the facts collectively which have a bearing upon such market value, in order to determine it. But such facts only indicate what the fair market value is and there is no occasion to resort to them, and it is wrong to do so, when the market value is established by a fair sale of the property in question or like property. *State ex rel. Geipel, supra,* at 733–34, 229 N.W.2d at 589 (quoting *State ex rel. Enterprise Realty Co. v. Swiderski,* 269 Wis. 642, 645, 70 N.W.2d 34, 35 (1955)). [Emphasis in original.] [4]

The circuit court affirmed the assessments on certiorari because it did not consider the *lease* of special improvements sufficiently equivalent to a *sale* of property for application of the "best information" rule. The trial court stated: "First of all no 'sale' ever took place.

[4] This rule was made binding on assessors and boards of review in *State ex rel. Hennessey v. City of Milwaukee,* 241 Wis. 548, 550–51, 6 N.W.2d 718, 719 (1942). Prior to that, it had been applied to court valuations in probate proceedings. *Estate of Ryerson,* 239 Wis. 120, 300 N.W. 782 (1941). It has been consistently restated by our supreme court in every property valuation case since then, and was recently applied in *State ex rel. Geipel, supra. See also State ex rel. Kaskin v. Board of Review,* 91 Wis.2d 272, 282 N.W.2d 620 (Ct. App. 1979), rejecting a county assessor's reliance on "comparable sales" to establish fair market value because, unlike here, no individualized comparison between taxpayer's property and the properties sold was made.

All that happened was a leasing of the premises to two new tenants at about the same rent previously charged Foley & Lardner. . . . Since no one sold anything it cannot be considered as a 'comparable sale.' "

While the "best information" rule is often stated in terms of sale and arose out of actual sales where title, possession, and all indicia of ownership were transferred, recent decisions of the Wisconsin Supreme Court indicate that "sales" are just one species of the broader category of "transactions" sufficient to trigger application of the "best information" rule. Thus in *State ex rel. Lincoln Fireproof Warehouse Co. v. Board of Review*, 60 Wis.2d 84, 208 N.W.2d 380 (1973), the supreme court rejected a challenge to application of the "best information" rule in the following terms: "There is nothing in the record to support the conclusion that the sale was not an arms-length *transaction* conducted by parties willing but not compelled to *transact*." *Id.* at 99, 208 N.W.2d at 387 (emphasis added). In *State ex rel. Geipel, supra,* the supreme court held that for application of the "best information" rule, execution of an option to purchase agreement should be treated no differently from other sales solely because it was not an outright sale:

A threshhold question in the instant case is whether the contract . . . should be treated differently from other sales merely because it is an option to purchase rather than an outright sale. We hold that such fact alone should not be determinative. If the agreement was the result of arm's-length negotiations and is reasonably contemporaneous with the assessment, the agreed price like a sale price, is the best indicator of market value. . . . Therefore, we consider the agreement to be in the nature of a sale for purposes of valuation. *State ex rel. Geipel, supra* at 734, 229 N.W.2d 589.

We conclude that in this case, where value of special leasehold improvements is at issue, the 1974 lease of the

same or similar leasehold improvements is also "in the nature of a sale" for purposes of valuation of those special leasehold improvements.

Uncontroverted evidence was presented to the board of review that special leasehold improvements similar to those located at 777 East Wisconsin Avenue and valued in 1975 and 1976 existed at lessee's former North Water Street offices. At the first hearing, lessee's administrative partner testified that the general floor plan at the former offices was quite similar to that at the new location, with the 15th floor at 735 North Water Street serving as a prototype for the layout of all three floors at the new location. An officer of lessor testified that the special leasehold improvements at both locations were quite similar, with the 14th and 15th floors at Water Street connected by three stairwells, similar special library and interior conference rooms existing at each location, and the same quality walnut millwork in an 18th century Williamsburg motif installed throughout at each location. At the second board of review hearing, the same officer again testified that the special leasehold improvements at the two locations were "quite comparable," citing similar design, similar Williamsburg style, and reasonably contemporary development. This evidence is uncontroverted by any other evidence in the record, including Steffen's testimony that at North Water Street partners were housed on one floor with associates on the other two, while at East Wisconsin Avenue the offices of both are intermixed. Steffen's testimony is merely cumulative to testimony of one of appellants' expert witnesses that the improvements at both locations were similar because both resulted in an unusually high ratio of individual offices to square footage leased.

Respondents argue that the special leasehold improvements are not reasonably comparable because evidence

was presented allegedly establishing that they are located in buildings at significantly different locations. While the rental rate for both unimproved space and space with special leasehold improvements may be lower at one location than another, the net difference at each location would be the same. It is the location, type, and layout of the special leasehold improvements within each building which determines comparability, not the location of each building housing them.

It is also uncontroverted that in 1974, after lessee vacated the offices at Water Street, lessor was not able to lease the space with the improvements for the same rent it had been able to command from lessee. Uncontroverted evidence showed that only one of the two new tenants occupying lessee's former office space paid close to the rent lessee had paid, and this rent did not include any amount for lessee's special leasehold improvements. Those improvements were torn down or modified to suit this new tenant, whose rent was increased to recoup lessor's remodeling costs.

The board of review stated in its findings and conclusions that "[t]here were no sales of like property except for some testimony concerning the law firm's previous rental quarters on North Water Street, which testimony indicates some aspects of a distress situation." On certiorari, the circuit court modified this finding by placing a period after "N. Water Street" and deleting the balance. As a matter of law, he held that there was no credible evidence supporting a finding of a distress situation, because "there is no question our state's largest bank has the staying financial power to wait until a proper and stable tenant appears which did occur after many hours and months of effort." We agree.

Nonetheless, respondents rely on the same evidence underlying the original finding to argue that the 1974 rental transactions do not evidence an owner willing but

not obligated to "sell," and a "buyer" willing but not obligated to "buy." "The sale must be a fair, arm's-length transaction without compulsion or pressure on either party, and the taxpayer has the burden of showing that the sale was made under normal conditions." *State ex rel. Geipel, supra,* at 734, 229 N.W.2d at 589.

Appellants presented credible, uncontroverted evidence that terms were negotiated freely and openly between lessor and each of the two tenants who ultimately rented lessee's vacated offices. Lessees were able to demand changes in the leasehold improvements to suit their needs; lessor was able to command higher rent to recoup the cost of these changes. There is no evidence in the record that lessor or either of the new tenants were in "necessitous circumstances" despite general economic conditions and a high downtown office vacancy rate. *See State ex rel. Geipel, supra,* at 735–36, 229 N.W.2d at 590 (quoting *State ex rel. Lincoln Fireproof Warehouse Co., supra*). There is no evidence in the record indicating that the 1974 rental transactions were anything other than in good-faith and at arms-length. *See Rosen, supra,* at 665, 242 N.W.2d at 686.

We emphasize that the lease agreement in this case, unlike mere offers to sell or rent, were similar to a sale or option to purchase because the transactions by which the premises were rented actually occurred between owner-lessees willing but not obliged to transfer occupancy and possession to occupant-lessees willing but not obliged to acquire occupancy and possession.

In the circumstances of this case, we conclude that the re-leasing of the premises at 735 North Water Street, formerly occupied by Foley & Lardner, to other law firms, were fair, arm's-length transactions that established that special leasehold improvements of the kind which are the subject of the assessments in this case have no fair market value. Those transactions were the best

information of the value of the special leasehold improvements involved in this case.

We conclude that the board of review and circuit court on certiorari erred as a matter of law by disregarding credible, uncontroverted evidence constituting "best information" of the fair market value of the subject property. Resort to formulas or extrinsic factors constituted error. *See State ex rel. Geipel, supra,* at 723, 229 N.W. 2d at 589.

Although it may be contended that application of the "best information" rule in this case will ultimately result in valuations of zero, such a result is consistent with the method of valuation established by statute and long in effect in this state. In *State ex rel. Northwestern Mutual Life Insurance Co. v. Weiher,* 177 Wis. 445, 188 N.W. 598 (1922), the taxpayer had constructed an elaborate, costly improvement upon real estate which was uniquely suited to its needs, and the assessor based his valuation on a hypothetical situation where he estimated what the owner, who had the improvements built to its specifications, would have been willing to pay for the building had it been built by a third party to its specifications. Our supreme court rejected this method of valuation as contrary to the statutorily mandated test (now sec. 70.32, Stats.):

The claim is that the building has an intrinsic worth in excess of the sum it would sell for because it was built for a specific purpose and if sold would have to be sold for a use or purpose for which it was not built, hence its selling price would not reflect its actual value based upon its reasonable intrinsic worth. This is true; and herein would lie the difficulty of solving the question of the proper assessed value but for the statutory rule and the construction given it by this court, if that can be said to be construction which but repeats the language of the statute. The statutory rule of assessment of real estate is to assess it at its sale value and not at its intrinsic value if that differs from the sale value. *Id.* at 447–48, 188 N.W. at 598.

In this case we have a fine, substantial, artistic building, gracing half a block in the city of Milwaukee, built to meet the peculiar needs of its owner, and not well adapted for other uses. The state says, Tax it at its sale value. *Id.* at 449, 188 N.W. at 599.

It is true that in cases such as this too low a valuation seems at first blush to be established for taxation purposes. But it must be borne in mind that the state asks a tax only upon the business value of the property of its citizens, if that term may be used, because such value is readily ascertainable for reasons already stated, and that buildings built in such a manner that they cannot be resold for their fair intrinsic worth or near their actual cost will not often be constructed. *Id.*[5]

From the uncontroverted evidence presented at the board of review hearings, an ultimate valuation of zero does not appear to be an unusual result in commercial lease situations. Expert evidence in this case established that commercial lessors rarely realize anything for a prior tenant's special leasehold improvements. Appellants' expert testified that a commercial lessor must include remodeling costs in yearly operating expenses "because you are going to have it." Respondents' expert testified: "My experience is that you remodel almost every space, over a couple thousand feet, to some degree, more or less, before you can even advertise a new tenant into the space." He further testified that even where a lessor installs special leasehold improvements to a pro-

---

[5] The court in *State ex rel. N.M.L. Ins. Co.*, supra, at 449, 188 N.W. at 599, emphasized use of "actual sales of like or similar property" in arriving at fair market or sale value, although in the case before it, unlike here, the assessor did not have the benefit of such sales in reaching his valuation.

We think it important to note that the ultimate goal of assessment of property for purposes of taxation, pursuant to ch. 70, Stats., is premised upon determining its fair market value. Intrinsic value to the owner, if different from fair market value, is irrelevant. The circumstances are different in eminent domain compensation. If the property taken has no market value, the intrinsic value to the owner is considered because it is desired to compensate the owner for property that is involuntarily taken.

spective tenant's specifications, rental is a matter of negotiation, and the lessor may recover all, part or none of his extra expense. Just as "best information" evidence may establish a positive value, in some cases it may also establish a fair market value of zero.

This result is corroborated by uncontroverted evidence that lessee had to have some of the walnut millwork at the East Wisconsin Avenue office space removed. Lessee attempted to sell it, but ended up realizing nothing because the sale price only covered the cost of removal necessary to effect the sale.

## III.   INTRINSIC VALUE

Appellants argue that when fair market value was estimated, intrinsic value of the special leasehold improvements to lessee was improperly considered. The record evidences cause for appellants' concern because one member of the board of review repeatedly made reference to value of the improvements to lessee, as did Steffen while being cross-examined. As we earlier noted, consideration of intrinsic value was expressly rejected by our supreme court in *State ex rel. Northwestern Mutual Life Insurance Co., supra,* at 448, 188 N.W. at 598: "The statutory rule of assessment of real estate is restricted to its sale value in the open market and is not concerned with its intrinsic value if it differs either more or less from the sale value." There is no occasion to consider intrinsic value when an arm's-length transaction establishes value, just as there is no occasion to resort to formulas or extrinsic factors which can be tainted by considerations of intrinsic value. Here, the 1974 rental transactions establish fair market value and negate any possible considerations of intrinsic value.

*By the Court.*—Judgment reversed; cause remanded with directions to enter judgment vacating the assessments.